(April Term, 1940)

## STATE BOARD OF EQUALIZATION v. BLIND BULL COAL CO.

(No. 2144; April 16, 1940; 101 Pac. (2d) 70)

For the appellant, there was a brief by *Ewing T. Kerr*, Attorney General; *Harold I. Bacheller*, Deputy Attorney General; and *Arthur Kline*, Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Kline*.

For the respondent, there was a brief by *Ivan S. Jones* of Kemmerer, Wyoming; *Thatcher & Young* of Ogden, Utah; and *A. A. Merrill* of Idaho Falls, Idaho, and oral argument by *Roy D. Thatcher*.

*Ewing T. Kerr, Harold I. Bacheller* and *Arthur Kline* in reply.

**444**

KIMBALL, Justice.

Plaintiff, the state board authorized to administer and enforce the Emergency Sales Tax Act of 1935, Sess. Laws 1935, ch. 74, appeals from a judgment against it in an action to recover taxes that defendant failed to collect on sales of coal during the years 1935 and 1936. The defense was that the sales were in interstate commerce and the taxes prohibited by section 8 of article 1 of the federal constitution providing that "The congress shall have power * * * to regulate commerce * * * among the several states." Judgment was for defendant on that ground.

The act levied "a tax upon every retail sale of tangible personal property made within the State of Wyoming equivalent to two per cent. of the purchase price paid or charged." Section 4. It was contemplated that the tax be paid by the buyer to the seller, and the latter was "responsible for the collection of the amount of the tax," which when due and unpaid "shall constitute a debt due the state" from the seller. Sections 5 and 11. There were certain exemptions including "all sales which the State of Wyoming is prohibited from taxing under the constitution or laws of the United States." Section 6.

The material facts are not in dispute. Defendant sold coal at its mine in Lincoln County, Wyoming,

about 35 miles east of the Idaho-Wyoming boundary line. There was no nearby railroad, and the coal was taken from the mine in trucks. It was stipulated that:

"All of the sales in question were sales of coal made by the defendant to sundry persons at or near the defendant's mine in Lincoln County, Wyoming. All of said coal was delivered to and received by the various purchasers thereof at or near the mine of the defendant in Lincoln County, Wyoming. Such purchasers after receiving said coal transported it into the State of Idaho for use or consumption. The records of the defendant do not show that such coal was purchased for transportation into Idaho or elsewhere and no claim of exemption was made by any purchaser and filed with the defendant."

The parties reserved the right to adduce evidence, not contradictory to the facts stipulated, and "tending to establish the character of the movements of said coal as being interstate or intrastate." It may be conceded that there was evidence sufficient to show that the coal was hauled by people who went from Idaho to the mine for the sole purpose of buying the coal, and who, as soon as it was bought and delivered to them, took it into Idaho where from the first they intended to take it. In defendant's brief it is said that the coal "could go nowhere else," that "the interstate movement was inevitable," but this cannot be conceded. The road runs from the mine north and west until it connects with a north and south main highway in Wyoming near the Idaho line. Trucks arriving at the junction may go either south through the Star Valley in Wyoming or north and west through Alpine, Wyoming, and thence into Idaho. About ten per cent. of defendant's product was taken south from the junction to the Star Valley, and about ninety per cent., including the coal in question, was taken north and west into Idaho. Defendant, probably having in mind the last sentence in the opinion in Superior Oil Co. v. Mississippi, infra,

says there is "a great dramatic movement of coal from Wyoming to markets outside its borders." There was no evidence to show this, but we are asked to notice it as a matter of common knowledge. We are far from thinking that the amount of coal taken to markets outside of Wyoming is material on the question of the validity of the tax on retail sales in Wyoming (see Oliver Iron Co. v. Lord, 262 U. S. 172, 177), and if it were material, our information on the subject from statistical reports called to our attention would be contrary to defendant's contention. The reports indicate that Wyoming mines produced annually about 5,500,000 tons of which 4,200,000 tons have been used by railroads taking the coal in the state. We do not know how much of the rest was used locally, and cannot assume that there was a great amount left for shipment to markets in other states.

We cannot agree that there was anything unusual or significant in the movements at the mine. The buyers came in empty trucks and drove first to the scalehouse where the trucks were weighed; then to bins in the tipple where they obtained their loads; returned to the scalehouse where the loaded trucks were weighed, the loads adjusted to meet the customers' wants and sales slips showing the buyers' names and addresses issued by the scalemaster and signed by the buyers. The buyers then paid for the coal and drove away with it.

For authority on the question to be decided we look to decisions of the federal courts. Cases discussing the power of the states to regulate interstate commerce by prohibitions, penalties or discriminatory exactions that place it at a disadvantage as compared or in competition with intrastate commerce may be put aside. The taxes in question here were imposed on all local sales. There was no discrimination, unless one is created in favor of non-resident buyers by exempting sales like those in question. The sales contracts did not involve

any extrastate orders nor require interstate deliveries, but were made and fully performed in this state. It is true that interstate commerce includes the buying in one state and the selling in another, as has been frequently stated in cases drawing in question the right of congress or of a state to regulate an interstate business. But these cases have frequently been treated as irrelevant in considering the validity of a nondiscriminatory tax on goods or sales of goods that had been or were about to be transported from one state to another. See Bacon v. Illinois, 227 U. S. 504, 516; Sonneborn Bros. v. Cureton, 262 U. S. 506, 515; Eastern Air Transport v. Tax Comm., 285 U. S. 147, 152-153; Minnesota v. Blasius, 290 U. S. 1, 8. The interstate commerce clause of the constitution does not in terms prohibit state taxes. Congress is authorized to regulate the commerce, and the state tax is not invalid unless it so far affects the commerce as to amount to a regulation that impairs the authority of congress. Swift & Co. v. United States, 196 U. S. 375, 399; McGoldrick v. Berwin-White Coal Mining Co., 84 Law ed. Adv. Ops., 343, 346, 60 S. Ct. 388, 391.

The manufacture, production and sale in one state of a commodity for transportation or use in interstate commerce, and its keeping, use and sale in the state to which it is transported have been treated as local transactions that may be the subjects of non-discriminatory taxes. We refer to only a few of the illustrative cases. The generation of electricity though the generation and interstate transmission were practically instantaneous (Utah Power & Light Co. v. Pfost, 286 U. S. 165); the production of natural gas that passed into interstate commerce by continuous movement from the wells (Hope Gas Co. v. Hall, 274 U. S. 284); the mining of ore that passed at once into the channels of interstate commerce to fill existing contracts with customers outside the state (Oliver Iron Co. v. Lord,

262 U. S. 172) ; a sale of gasoline either for immediate use in interstate commerce (Eastern Air Transport v. Tax Comm., 285 U. S. 147), or for immediate transportation to another state (Superior Oil Co. v. Mississippi, 280 U. S. 390) are examples of taxable local events or activities that precede the interstate transportation or use. In the destination state the goods themselves, while still in the original packages (American Steel & Wire Co. v. Speed, 192 U. S. 522), or the sales thereof (Woodruff v. Parham, 8 Wall. 123), or the storage or use (Henneford v. Silas Mason Co., 300 U. S. 577) may be subjected to a tax that does not have the effect of putting the interstate commerce at a disadvantage. Henneford v. Silas Mason Co., supra, at p. 582, contains the general statement quoted from Eastern Air Transport v. Tax Comm., 285 U. S. 147, 153: "A nondiscriminatory tax upon local sales * * * has never been regarded as imposing a direct burden upon interstate commerce and has no greater or different effect upon that commerce than a general property tax to which all those enjoying the protection of the state may be subjected."

Perhaps we should have been content to rest our decision solely on the authority of the case of Superior Oil Co. v. Mississippi, 280 U. S. 390, which counsel inform us was not cited in the trial court. That case seems to have been decided under a law and upon facts not materially different from those in the case at bar. Mississippi sued the oil company to collect a tax on sales of gasoline. The defense was that the sales were in interstate commerce. The oil company had sold the gasoline to packers in Mississippi and delivered it at the packers' wharves where it was loaded on their fishing boats and sent to Louisiana and there delivered to fishermen for use in fishing in Louisiana waters. In each transaction there was a bill of lading providing that the gasoline should remain the property of the

oil company until it was delivered in Louisiana. It was held that the bill of lading could not affect the case, because the parties "could not convert what was exclusively a local business, subject to state control, into an interstate commerce business protected by the commerce clause." It was conceded, however, that "there was a regular course of business" known to the oil company, "that took the gasoline into another state," and said that "if by mutual agreement the oil [sic] had been put into the hands of a third person, a common carrier, for transportation to Louisiana, the mere possibility that the vendor might be able to induce the carrier to forego his rights might not have been enough to keep the transaction out of interstate commerce." At this point in the opinion A. G. Spalding & Bros. v. Edwards, 262 U. S. 66, is cited with the remark that it was "a case of foreign export, see Sonneborn Bros. v. Cureton, 262 U. S. 506, 520, 521." The court then continues: "But here the gasoline was in the hands of the purchaser to do with as it liked, and there was nothing that in any way committed it to sending it to Louisiana except its own wishes. If it had bought bait for fishing that it intended to do itself, the purchase would not have been in interstate commerce because the fishing grounds were known by both parties to be beyond the state lines." The tax was upheld.

The trial court in the case at bar was probably influenced by A. G. Spalding & Bros. v. Edwards, 262 U. S. 66, as was the California court in Standard Oil Co. v. Johnson, 33 Cal. App. (2d) 430, 92 P. (2d) 470. We think the Spalding case and its citation in the Superior Oil Company case by the Justice who wrote both opinions show that the later decision is the better authority in the case at bar. In the Spalding case the tax was on sales of goods that were delivered to the exporting carrier pursuant to the sales contract. "The very act that passed the title and that would have incurred the

tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea, for the purpose of export and with the direction to the foreign port upon the goods." 262 U. S. 69. In the later decision (280 U. S. 395) it was noted that the Spalding case was a case of foreign export and Sonneborn Bros. v. Cureton, 262 U. S. 506, 520, 521 was referred to. The Sonneborn case speaks of the "injustice that would arise if the constitutional immunity from state taxation as to imports from abroad were to be held to apply to imports from one state to another." See Powell in 76 U. of Pa. Law Rev. 777, note; Lockhart in 52 Harv. Law Rev. 635.

Recent cases, from Wiloil Corp. v. Pennsylvania, 294 U. S. 169, to McGoldrick v. Berwind-White Coal Co., supra, do not presage any extension of tax immunity under the commerce clause. In J. D. Adams Mfg. Co. v. Storen, 304 U. S. 307 and Gwin, White & Prince v. Henneford, 305 U. S. 434, the exactions in question could not survive a test made articulate in Western Live Stock v. Bureau, 303 U. S. 250, which, as applied in Gwin, White & Prince v. Henneford, supra, is that the tax is invalid if, in its practical operation, it discriminates against interstate commerce by imposing upon it, merely because interstate commerce is being done, the risk of a multiple burden to which local commerce is not exposed. 305 U. S. 439. The taxes in question in the case at bar do not expose the commerce to the risk of such a multiple burden. See Coverdale v. Arkansas-Louisiana P. L. Co., 303 U. S. 604, 612-613; Traynor in 28 Calif. L. Rev. 173-175.

The judgment will be reversed and the case remanded to the district court with instructions to enter judgment for plaintiff.

*Reversed.*

RINER, Ch. J., and BLUME, J., concur.